UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>MICHAEL GORDON, et al.<br><br>Defendants. | No. 14-CR-10304-DPW |

**REPORT AND RECOMMENDATION REGARDING
DEFENDANT DAPHNE JEAN'S MOTION TO SUPPRESS
(Dkt. No. 206)**

January 25, 2017

CABELL, U.S.M.J.

**I.    INTRODUCTION**

Law enforcement agents interviewed defendant Daphne Jean at her workplace on November 6, 2014, and then again at her residence approximately a month later, on December 3, 2014.  She moves to suppress evidence of the first interview on the ground that it was a custodial interrogation and the agents failed to first advise her under *Miranda* that she had a right to an attorney.  She contends that the second interview was in essence a continuation of the first interview and should be suppressed for similar reasons.  I find, however, that the defendant was in fact advised that she had a right to an attorney and the motion is thus based on a flawed factual premise.  In any event, the workplace interview did not constitute a custodial interrogation and agents therefore were not required to advise the defendant of her rights prior to speaking with her.  I accordingly recommend that the motion to suppress be denied.

## II.     FINDINGS OF FACT

An evidentiary hearing was held in this matter on October 24, 2016.  Homeland Security Investigations (HSI) Special Agent (SA) Paul Hartigan testified on behalf of the government.  The defendant did not testify but she did submit an affidavit.  Based on SA Hartigan's testimony and the parties' papers, the Court makes the following findings of fact.

As of November 6, 2014, the defendant was working at Tufts Medical Center in Boston, MA.  On November 6, 2014, SA Hartigan went to her workplace along with a colleague, Task Force Officer (TFO) Tony Freitas, with the intent to interview the defendant in connection with the investigation of co-defendant Michael Gordon and others.  SA Hartigan was not actively involved with the underlying investigation.  Rather, SA Atwood was the lead case agent and he asked SA Hartigan to conduct the interview.  SA Hartigan otherwise had no involvement with the investigation.  According to SA Hartigan, he was not told to arrest the defendant and he did not have an intent to arrest her.

When the officers arrived at Tufts Medical Center, SA Hartigan spoke with the first person he encountered there, Tufts Director of Public Safety Michael Crisp.  SA Hartigan told Crisp that he wanted to interview the defendant.  Crisp in turn went to find the defendant and brought her to his office.  He then left, leaving SA Hartigan, TFO Tony Freitas and the defendant alone in his office.

Crisp's office contained a desk and a round table that was pushed up against one wall.  The office was large enough to comfortably fit three people.  SA Hartigan sat at the round table with his back to the door, which was about four feet behind him.  TFO Freitas sat to SA Hartigan's right.  The defendant sat to the right of TFO Freitas, and closest to the wall.  Because

the table was pushed up to the wall, the defendant could only exit the office by walking past both SA Hartigan and TFO Freitas.

Both SA Hartigan and TFO Freitas were dressed in plainclothes.  Both men were armed but SA Hartigan does not recall if their weapons were visible.  It is possible that they were.  However, neither SA Hartigan nor TFO Freitas ever drew their weapons or otherwise brandished them during the interview.

The interview began at approximately 11:15 a.m.  SA Hartigan advised the defendant that she was not under arrest and that she was free to leave.  SA Hartigan stated that it was his practice to give this advice in all non-custodial interviews.  SA Hartigan then spent the next several minutes of the interview developing a rapport with the defendant and confirming that she consented to the interview.

SA Hartigan testified that it was also his practice to read witnesses a statement of their rights before all interviews, including non-custodial interviews.  Based on SA Hartigan's report, he read the defendant her rights at approximately 11:27 a.m., from the standard United States Immigration and Customs Enforcement "Statement of Rights" form in use at that time.  After advising the defendant of her rights, SA Hartigan presented the form to the defendant and she signed the form to reflect that she acknowledged and waived her rights.

For reasons that are not clear, the government subsequently lost this signed version of the form.  At the hearing, however, SA Hartigan produced an unsigned, sample copy of the form, which he testified was identical in all other respects to the form he presented to the defendant at the interview.  Under the heading "STATEMENT OF RIGHTS," the form provides the following:

> Before we ask you any questions, it is my duty to advise you of your rights.  You have the right to remain silent.  Anything you say can be used against you in court,

> or other proceedings.  You have the right to consult an attorney before making any statement or answering any questions.  ***You have the right to have an attorney present with you during questioning.  If you cannot afford an attorney, one will be appointed for you before any questioning, if you wish.  If you decide to answer questions now, you still have the right to stop the questioning at any time, or to stop the questioning for the purpose of consulting an attorney.***  (emphasis added).

Underneath the advice of rights, the bottom half of the page bears a heading that reads "WAIVER," with the accompanying language:

> I have had the above statement of my rights read and explained to me and I fully understand these rights.  I waive them freely and voluntarily, without threat or intimidation and without any promise of reward or immunity.  I was taken into custody at _____(time), on _____(date), and have signed this document at _____(time), on _____(date).

Notably, the defendant's affidavit does not directly contradict SA Hartigan's testimony that he advised her of her rights, including her right to an attorney.  The defendant averred, somewhat carefully, that she did "not remember them showing [her] a Statement of Rights or asking [her] to sign any such statement."  (Defendant's Affidavit, ¶ 6).  She also averred, again with something less than absolute certainty, that "[t]o the best of [her] memory, they did not tell [her] [she] had the right to consult with an attorney, or to have an attorney present while they questioned [her]."  (Id.).  As such, there is not a true dissonance between SA Hartigan's testimony and the defendant's averments.  To the extent there is, though, I credit SA Hartigan's testimony that he did advise the defendant of her right to an attorney where his testimony was subject to cross-examination and, moreover, was consistent with the contemporaneous official report he prepared following the interview.

Prior to answering SA Hartigan's questions, the defendant never expressly stated that she was willing to be interviewed, but she also did not expressly decline to be interviewed.  SA Hartigan believed, based upon the defendant's willingness to answer questions after being informed of her rights, that she consented to be interviewed.  Based upon her responses, he also

4

felt confident that the defendant understood his questions and spoke fluent English. SA Hartigan described the defendant's demeanor throughout the interview as "calm and talkative."

After the defendant signed the waiver form, SA Hartigan informed her that her boyfriend (co-defendant Michael Gordon) had been arrested. He also informed her that other agents were currently executing a search warrant at her apartment. SA Hartigan then proceeded to question the defendant. The defendant in turn answered most of his questions, except for a few she said she did not feel comfortable answering.

Approximately half-way through the interview, SA Hartigan received a phone call and learned that the search of the defendant's apartment had yielded two pounds of marijuana. SA Hartigan told the defendant about the marijuana because he felt that she was not being forthcoming; he hoped that by being forthcoming himself with this information, he might prompt her to do the same. He continued to question the defendant. After approximately one hour of questioning, the defendant returned to work and the agents left.

Approximately one month later, on December 3, 2014, HSI SAs Richard Atwood and Michael Balestra attempted to contact the defendant for a second interview. The defendant was not home and the agents left a message. However, at almost noon that day, the defendant returned SA Atwood's call. SA Atwood asked the defendant if she would consider answering additional questions. The defendant said she had to go to school but would think about it. Later that day, at around 2:50 p.m., the defendant called SA Atwood and stated she was willing to answer additional questions and that she would be home after 5 p.m.

Accordingly, SAs Atwood and Balestra went to the defendant's apartment at 5 p.m. that evening. The defendant had a friend with her and asked if she could stay for the interview. The agents agreed. They informed the defendant that she was under no obligation to talk to them.

The defendant agreed to answer the agents' questions and in fact asked if she could get back a computer officers had seized during the prior search.

### III.   DISCUSSION

The defendant argues that the workplace interview was a custodial interrogation requiring that she be advised of her rights under *Miranda v. Arizona,* 384 U.S. 436 (1966).  In *Miranda,* the Supreme Court held that statements are generally inadmissible against a defendant if obtained during "custodial interrogation" without prior warnings that the suspect "has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 444.  But even assuming for the moment that the workplace meeting amounted to a custodial interrogation, there was demonstrably no *Miranda* violation here because SA Hartigan *did* advise the defendant of her rights, including her right to an attorney.  As noted, the Court credits SA Hartigan's testimony on this point where it was both tested through cross-examination and consistent with the report he prepared around the time of the interview.  The defendant's affidavit does not match SA Hartigan's testimony but it does not explicitly contradict it either, and the defendant chose not to offer witness testimony to challenge his testimony.  In short, there was no *Miranda* violation and the motion to suppress fails.

Regardless, the facts here do not make out a custodial situation.  "Custodial interrogation requires that a defendant was both 'in custody' and subjected to 'interrogation.'" *United States v. Jackson,* 544 F.3d 351, 356 (1st Cir. 2008) (citing *United States v. Genao*, 281 F.3d 305, 310 (1st Cir.2002) & *United States v. Ventura*, 85 F.3d 708, 710 (1st Cir.1996)).  Determining whether an individual is in custody for purposes of Miranda is a two-step examination.  One begins by examining all of the "circumstances surrounding the interrogation" and asking whether

"a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *United States v. Ellison*, 632 F.3d 727, 728-29 (1st Cir. 2010) (quoting *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457 (1995). This initial determination "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323, 114 S.Ct. 1526 (1994) (per curiam). If the court finds that a reasonable person in the suspect's position would not have felt free to end the interview and walk away, the second question asks whether there was "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Yarborough v. Alvarado,* 541 U.S. 652, 663 (2004) (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). As both parties note, the First Circuit has identified a number of (non-exhaustive) factors to be considered in deciding whether an individual is in custody, including "'whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation.'" *United States v. Nishnianidze*, 342 F.3d 6, 13 (1st Cir. 2003) (quoting *United States v. Masse*, 816 F.2d 805, 809 (1st Cir. 1987)).

In this case, the interview took place during the day, at the defendant's workplace, and in Crisp's office, a neutral location in context. There were only two law enforcement officers present and both were dressed in plainclothes. And although SA Hartigan was positioned between the defendant and the door to Crisp's office, the defendant was not handcuffed or restrained or prevented at any time from leaving. Further, while both officers were armed, and while their firearms may have been visible, neither officer brandished his firearm or did anything to draw attention to it. Further still, the session lasted only an hour, and there is no evidence SA

7

Hartigan at any time acted in an unprofessional or unfriendly manner, or did anything to convey to the defendant that she was not free to go.  Taken as a whole, these facts demonstrate that the defendant was not in custody during the interview.  *See e.g., United States v. Hughes,* 604 F. 3d 428, 435 (1st Cir. 2011) (no custody where interview occurred in familiar surroundings, only two of four officers present took part in the interview, the officers wore plain clothes, there was no show of force, the officers' weapons were visible but remained in their holsters and were not brandished, and no meaningful physical restraint was applied).

And for the same reasons, there is no basis to find that the subsequent meeting between agents and the defendant the following month constituted a custodial interrogation.  On the contrary, the voluntariness of the meeting is demonstrated by the fact that the meeting only took place after the defendant mulled the agent's request for a follow-up meeting and called him back to assent to his request.  The meeting took place in the defendant's home, and there is no suggestion that her movements were in any way restricted.  Further, the defendant was able to have a friend sit in with her during the meeting.  Indeed, although the defendant moves to suppress evidence from this meeting, she does not in her papers meaningfully advance any serious argument calling the meeting's voluntariness into question.

## IV.   CONCLUSION

For the foregoing reasons, it is recommended that the motion to suppress be DENIED.  The parties are hereby advised that under the provisions of Federal Rule of Criminal Procedure 59(b) any party who objects to this recommendation must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such

objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 59(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation.  *See Keating v. Secretary of Health and Human Servs.*, 848 F.2d 271 (1st Cir. 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980); *United States v. Vega*, 678 F.2d 376, 378-379 (1st Cir. 1982); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *see also Thomas v. Arn*, 474 U.S. 140 (1985).

        /s/ Donald L. Cabell
        DONALD L. CABELL, U.S.M.J.

DATED:  January 25, 2017